# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civ. No. 16-1440** |
| | : | |
| **ENDO PHARMACEUTICALS, INC., et al.** | : | |
| **Defendants.** | : | |

**Diamond, J.**                                                                                    **October 20, 2016**

# M E M O R A N D U M

Proceeding under the FTC and Clayton Acts, the Federal Trade Commission seeks injunctive and equitable relief against brand-name and generic drug manufacturers for entering into different agreements that purportedly delayed market entry of two different generic drugs intended to treat two different maladies.  Defendants have moved to sever the claims with respect to each drug, arguing that the challenged agreements, underlying circumstances, generic manufacturers, and the drugs themselves have nothing to do with each other.  Remarkably, the FTC suggests that if I sever, I should transfer the actions to other Districts—where similar, private-party MDL actions are pending—and, if I do not transfer, threatens voluntarily to withdraw its split claims and refile them in those Districts.  I will nonetheless grant Defendants' severance Motions.  Having chosen to litigate in this District, it comes with ill grace for the FTC to pick up its marbles and play in venues more to its liking.  I will not transfer the claims. Should the FTC voluntarily withdraw them, I will entertain Defendants' requests for fees and costs.

## I.      Factual Background

The FTC brings this action against Defendants: Endo Pharmaceuticals Inc.; Endo International plc; Teikoku Pharma USA, Inc.; Teikoku Seiyaku Co., Ltd.; Watson Laboratories,

Inc.; Allergan plc; and Impax Laboratories, Inc.  The FTC alleges that in June 2010 Endo, which produced "Opana ER," agreed to pay Impax to delay its market introduction of its generic version of the drug.  The FTC also alleges that in May 2012 Endo and Teikoku, which produced and marketed "Lidoderm," agreed to pay Watson to delay its market introduction of its generic version of the drug.  (See Compl., Doc. Nos. 1 (under seal), 32 (redacted).)  Counts I and II of the FTC's Complaint relate solely to Opana ER, and Counts III through VI relate solely to Lidoderm.  (See id. ¶¶ 179-182 (Counts I and II), 183-190 (Counts III through VI).)  Because a decision to sever turns largely on the relatedness of the FTC's claims, I will set out the underlying factual allegations.

A.      Opana ER

In 2006, Endo introduced Opana ER, an extended-release version of oxymorphone that "relieves moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment."  (Id. ¶¶ 39-40.)  Opana was then the only extended-release oxymorphone drug on the market.  (Id. ¶ 40.)  A brand-name drug manufacturer must, within 30 days of the Food and Drug Administration's approval of a New Drug Application, submit to the Agency any patents covering its drug that could reasonably be asserted against any infringer.  (Id. ¶ 21 (citing 21 C.F.R. § 314.53).)  The FDA lists these patents in a publication known as the "Orange Book." (Id.)

The FTC alleges that at Opana's 2006 launch, Endo submitted only Patent No. 5,128,143, which was set to expire in September 2008.  (Id. ¶ 43.)  In October 2007, Endo added three patents relating to an extended-release mechanism:  Nos. 7,276,250; 5,662,933; and 5,958,456. (Id. ¶¶ 45-46.)  The '250 patent expires in 2023; the '933 and '456 patents expired in 2013.  (Id.)

On November 23, 2007, the FDA accepted Impax's Abbreviated New Drug Application

to produce a generic version of Opana.  (Id.)  Because that drug was subject to patents listed in the Orange Book, Impax's ANDA included a required "paragraph IV certification," providing that Impax's generic product did not infringe Endo's then-unexpired '933 and '456 patents.  (Id. ¶¶ 24, 48.)  On December 13, 2007, Impax notified Endo that it had submitted an ANDA with a paragraph IV certification.  (Id. ¶ 49.)  On January 25, 2008, Endo sued Impax for infringing the '456 and '933 patents.  (Id. ¶ 50.)  Because Endo sued within 45 days of Impax's paragraph IV notification, it triggered a statutory 30-month stay, preventing the FDA from granting final approval to Impax's ANDA until at least June 14, 2010 (absent an earlier finding in favor of Impax on the patent claims).  (Id. ¶¶ 25, 50.)

As alleged, Impax was the first generic manufacturer to file an ANDA with a paragraph IV certification for Opana's 5, 10, 20, 30 and 40 mg variants.  (Id. ¶ 50.)  Accordingly, Impax would receive a 180-day period of exclusivity for those dosage strengths.   (Id. ¶¶ 27, 51.)  Endo's lawsuit delayed Impax's entry into the market and thus further delayed market entry of all other generics with those dosage strengths.  (Id.)

During this period, Endo purportedly had been developing a crush-resistant version of Opana to protect against generic competition.  (Id. ¶ 56.)  As alleged, "Endo knew the success of Reformulated Opana ER would hinge on whether Endo could introduce the product before it faced . . . generic competition for Original Opana ER," and that "if Endo were to launch Reformulated Opana ER before generic entry, then Endo could expect to convert virtually the entire franchise to its reformulated product."  (Id. ¶¶ 57-58.)  The FTC thus alleges that Endo "decided to purchase the time it needed [to bring crush-resistant Opana to market] by paying Impax not to compete until January 2013."  (Id. ¶ 59.)

In June 2010—two days into the patent infringement trial and one week before Impax

3

was set to receive final FDA approval for its generic Opana—Endo and Impax entered into the "Settlement and License" and the "Development and Joint Promotion" Agreements.  (Id. ¶¶ 53, 60.)  Impax agreed to delay its launch of generic Opana until January 1, 2013.  (Id. ¶ 61.)  Endo in turn agreed to forego its legal right to launch an authorized generic during Impax's 180-day exclusivity period.  The FTC characterizes this as a payment because it "guaranteed that Impax would receive a cash value commensurate with the supracompetitive profits that come with being the only seller of generic Opana ER for 180 days."  (Id. ¶¶ 61, 63-64.)  Endo also agreed that if it shifted the market to crush-resistant Opana before Impax's entry, it would make a cash payment to Impax.  (Id. ¶¶ 68-69.)  The FTC thus alleges that because Endo made this shift, it was obligated to pay Impax over $102 million.  (Id. ¶ 69.)

During this time, Endo and Impax also entered into a Development and Joint Promotion Agreement, relating to a potential treatment for Parkinson's disease.  Endo allegedly paid Impax $10 million and agreed to make up to $30 million in additional milestone payments.  (Id. ¶¶ 60, 70-71.)

The FTC alleges that both these Agreements with Impax were intended to eliminate generic competition to Opana for two and a half years, in violation of Section 5(a) of the FTC Act (Count I).  15 U.S.C. § 45(a); (Compl. ¶¶ 158-164, 179-180.)  Finally, the FTC alleges that Endo willfully maintained a monopoly of extended-release oxymorphone—including through its execution of the Impax Agreements—in violation of Section 5(a) of the FTC Act (Count II).  15 U.S.C. § 45(a); (Compl. ¶¶ 158-164, 179-180.)

### B.     Lidoderm

An anesthetic skin patch made with lidocaine, Lidoderm reduces pain caused by shingles.  (Compl. ¶¶ 96-97.)  It was developed by Teikoku, whose New Drug Application the FDA

approved in March 1999.  (Id. ¶¶ 98.)  Endo purchases Lidoderm from Teikoku and has been the exclusive domestic seller of the drug since 1999.  (Id. ¶ 100.)

In November 2009, Watson filed an ANDA with a paragraph IV certification that its generic Lidoderm did not infringe Patent No. 5,827,529, a Teikoku patent (licensed to Endo) covering certain formulations.  (Id. ¶ 104-105.)  Because Watson was the first filer, Endo could block generic competition by delaying Watson's market entry.  (Id. ¶¶ 107.)  In January 2010, Watson notified Teikoku of its paragraph IV certification.  (Id. ¶ 108.)  Accordingly, on February 19, 2010, Endo and Teikoku sued Watson for infringing the '529 patent.  (Id. ¶ 109.)  Because Endo and Teikoku sued within 45 days of Watson's notification, an automatic 30-month stay was imposed, preventing the FDA from granting final approval to Watson's ANDA until mid-July 2012 (absent an earlier finding in favor of Watson on the patent claim).  (Id.)

In June 2011, Watson prevailed on claim construction of the '529 patent.  (Id. ¶ 113.)  A short time later, Endo separately sued Watson for violating three subsequently acquired patents—Nos. 5,741,510; 6,096,333; and 6,096,334—only one of which (the '510 patent) was in the Orange Book.  (Id. ¶ 114.)  In February 2012, a six-day trial was held on the '529 infringement claim.  The FTC alleges that "Watson was confident in its litigation position."  (Id. ¶ 115.)  Indeed, according to the FTC, Watson was preparing to launch its Lidoderm generic upon FDA approval, even though the infringement dispute was at yet unresolved.  (Id. ¶¶ 110-111.)

On May 28, 2012, Endo, Teikoku, and Watson settled all their patent disputes.  (Id. ¶ 116.)  As alleged, Watson agreed to delay its launch of generic Lidoderm until September 15, 2013.  (Id. ¶ 117.)  In exchange, Endo and Teikoku agreed to delay for at least 180 days (and up to seven and a half months) their legal right to launch an authorized generic; that obligation

would immediately terminate if a second generic product entered the market during this period. (Id. ¶¶ 117, 119-121.)  Watson purportedly agreed to pay Endo a 25% royalty on gross profits while its generic Lidoderm product was the only generic on the market (which the Parties characterized as "partially exclusive license").  (Id. ¶ 119.)  Endo and Teikoku also agreed to provide Watson with branded Lidoderm valued at $96 million between January and August 2013, and further agreed to provide an additional $144 million in branded Lidoderm during 2014 and 2015, should the FDA have denied Watson's ANDA.  (Id. ¶ 122.)

The FTC alleges that because the Watson Agreement eliminated generic competition to Lidoderm for more than one year, Endo, Teikoku, and Watson engaged in unfair competition in violation of Section 5(a) of the FTC Act (Count III).  15 U.S.C. § 45(a); (Compl. ¶¶ 158-164, 183-184.)  The FTC further alleges that the Agreement reduced competition to generic lidocaine patches for seven and a half months, and that Endo and Watson thus violated Section 5(a) of the FTC Act (Count V).  15 U.S.C. § 45(a); (Compl. ¶¶ 170-178, 187-188.)  Watson's acquisition of the "partially exclusive license" purportedly was an unlawful acquisition in violation of Section 7 of the Clayton Act (Count VI).  15 U.S.C. § 18; (Compl. ¶¶ 170-178, 189-190.)  Finally, the FTC alleges that Endo willfully maintained a monopoly in the lidocaine patch market, including through its execution of the Agreement with Teikoku and Watson, in violation of Section 5(a) of the FTC Act (Count IV).  15 U.S.C. § 45(a); (id. ¶¶ 144-150, 185-186.)

## II.   Procedural History

On March 30, 2016, the FTC filed its Complaint.  (Doc. Nos. 1 (under seal), 32 (redacted).)  The same day, the FTC and the Teikoku Defendants moved for the entry of a Stipulated Order for a Permanent Injunction.  (Doc. No. 3.)  I granted the Motion and entered the Stipulated Order on April 7, 2016.  (Doc. No. 14.)  The remaining Defendants have moved both

to sever and dismiss.  (Doc. Nos. 57-58, 69-70).

Although I have not yet decided the dismissal Motions, they may be fairly described as anything but frivolous.  The FTC has asked me to decide severance first.  (Doc. No. 84.)  As I discuss below, if I sever the Opana and Lidoderm claims, the Agency suggests that I transfer each set of claims to two Districts where MDL actions relating to each drug have been pending since 2014.  See In re Lidoderm Antitrust Litig., MDL No. 2521, N.D. Cal.; In re Opana ER Antitrust Litig., MDL. No. 2580, N.D. Ill.; (Doc. No. 73 at 20.)  If I decline that suggestion, the FTC states that it will voluntarily dismiss all claims and refile them in those Districts.  (Doc. No. 73 at 18-20.)

Defendants contend that the FTC, having brought the instant claims here even though it was aware of the long-pending MDL matters, now seeks transfer—and threatens dismissal and refiling—to avoid an unfavorable decision on the dismissal Motions.  (Doc. No. 76 at 1.)  Once again, Defendants' contentions appear to be anything but frivolous.

### III.     Legal Standards

#### A.     Severance

Defendants argue that under Rule 21, they have been misjoined.  The Rule provides that I "may at any time, on just terms, add or drop a party," either on motion or *mea sponte*.  Fed. R. Civ. P. 21.  I have "broad discretion in deciding whether to sever a party pursuant to [Rule] 21." Cooper v. Fitzgerald, 266 F.R.D. 86, 88 (E.D. Pa. 2010) (quoting Boyer v. Johnson Matthey, Inc., No. 02-8382, 2004 WL 835082, at *1 (E.D. Pa. Apr. 16, 2004)).

Rule 21 is "most commonly invoked to sever parties improperly joined under Rule 20." Boyer, 2004 WL 835082, at *1.  Rule 20(a)(2) provides that defendants may be joined in one action if:

(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
(B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2).  Joinder is proper only if *both* requirements are met.  See id.; 7 Wright & Miller, Fed. Prac. & Proc. § 1653.

"Courts generally apply a case-by-case approach in determining whether a particular factual situation meets the same transaction or occurrence test."  Miller v. Hygrade Food Prods. Corp., 202 F.R.D. 142, 144 (E.D. Pa. 2001).  In determining whether multiple claims arise from the same transaction or occurrence, I must look to whether a "logical relationship" exists among the claims.  See id. (citing Mosley v. General Motors Corp., 497 F.2d 1330, 1333 (8th Cir. 1974)); Malibu Media, LLC v. John Does, 1-18, No. 12-2095, 2012 WL 8264665, at *2 (E.D. Pa. Sept. 27, 2012); see also Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc., 292 F.3d 384, 389-90 (3d Cir. 2002) (construing Rule 13's "transaction or occurrence" requirement to mean that claims must "bear a logical relationship" to one another).  A logical relationship exists when "the central facts of each . . . claim arise on a somewhat individualized basis out of the same set of circumstances."  Simmons v. Wyeth Labs., Inc., No. 96-6631, 1996 WL 617492, at *3 (E.D. Pa. Oct. 24, 1996) (quoting In re Orthopedic Bone Screw Prods. Liab. Litig., MDL No. 1014, 1995 WL 428683, at *1 (E.D. Pa. July 15, 1995)).

The common question of law or fact required "necessitates a 'very low threshold.'"  Miller, 202 F.R.D. at 144 (citing Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 n.15 (3d Cir. 1998)).  "Plaintiffs need only share one common question of law or fact."  Id. (citing Barnes, 161 F.3d at 140).  "Courts in this Circuit have found that 'the same series of transactions or occurrences prerequisite under Rule 20 essentially consumes the second requirement that there arise a question of law or fact common to all joined parties.'"  DirecTV, Inc. v. Chorba, No. 02-

0843, 2003 WL 24178469, at *2 (M.D. Pa. Oct. 13, 2003) (quoting <u>Norwood Co. v. RLI Ins.</u> <u>Co.</u>, No. 01-6153, 2002 WL 523946, at *3 (E.D. Pa. Apr. 4, 2002)).

Because Rule 20 is permissive, "even when the requirements of the Rule are met," I "nevertheless maintain[] the discretion to sever defendants." <u>Patrick Collins, Inc. v. John Does</u> <u>1-30</u>, No. 12-3148, 2013 WL 1157840, at *2 (E.D. Pa. Mar. 21, 2013); 4 Moore, Moore's Federal Practice § 21.02(1) ("The courts have properly concluded that they may issue orders under Rule 21 even in the absence of misjoinder and non-joinder of parties, to construct a case for the efficient administration of justice."). I must "balance[e] several considerations, including the convenience of the parties, avoidance of prejudice to either party, and promotion of the expeditious resolution of the litigation." <u>Official Comm. of Unsecured Creditors v. Shapiro</u>, 190 F.R.D. 352, 355 (E.D. Pa. 2000) (citation omitted).

## B.    Transfer

I may *mea sponte* transfer an action to a different District "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a); <u>Amica Ins. Co. v. Fogel</u>, 656 F.3d 167, 180 (3d Cir. 2011). Where a plaintiff seeks transfer, "[c]ourts facing this issue have generally concluded . . . [that the motion] should be granted only when there are changed circumstances which have arisen since the time when the suit was instituted or when there is some basis in the interest of justice for transfer." <u>Valido-Shade v. Wyeth LLC</u>, No. 12-20003, 2014 WL 4794967, at *2 (E.D. Pa. Sept. 26, 2014).

## IV.    Discussion

### A.    Severance

Defendants argue that the "FTC's claims arise from wholly different sets of circumstances," and that Defendants have thus been misjoined. (Doc. No. 57-1 at 6-7; Doc. No.

58-1 at 1 ("The Federal Trade Commission has filed with this Court . . . two sets of wholly unrelated claims, crudely stitched together in a single Complaint.").)  I agree.

The FTC directs its Opana counts against Endo and Impax; its Lidoderm counts against Endo, Teikoku, and Watson.  (Doc. No. 57-1 at 7; Doc. No. 58-1 at 3-4.)  The particulars of the one claim against Impax (Count I) differ from those of the three claims against Watson (Counts III, V, and VII).  The FTC even organizes the factual allegations supporting its Opana- and Lidoderm- related claims under separate headings.  (See Compl. ¶¶ 38-95 (allegations labeled "Anticompetitive Conduct Concerning Opana ER"), 96-136 (allegations labeled "Anticompetitive Conduct Concerning Lidoderm.").)   Lidoderm is not mentioned once in the Opana-related allegations, nor is Opana mentioned once in the Lidoderm-related allegations. There is no allegation that Watson was involved in the Opana Agreements or an allegation that Impax had anything to do with the Lidoderm Agreement.  (Compare id. ¶¶ 38-95 (Opana allegations), with id. ¶¶ 96-136 (Lidoderm allegations).)  The claims concern different drugs, different markets, different patents, different patent litigations, different agreements, different alleged payments, different parties, and different timeframes.

The only "connection" the FTC alleges is Endo's motivation "to prevent lower-cost generic competition to its two most important branded prescription drug products."  (Id. ¶ 1.) The FTC thus argues that its claims are logically related because Endo, in pursuit of an "overarching plan to forestall generic competition to Opana ER and Lidoderm," entered into two similar reverse-payment agreements.  (Doc No. 73 at 6-8 ("Endo signed two similar agreements, negotiated in similar circumstances by the same core group of Endo executives as part of an overall plan to protect its primary revenue stream while it worked to diversify its product portfolio.").)

By the FTC's reasoning, any claims based on different "reverse-payment" agreements could be joined. That Endo seeks to maximize its profits hardly means that all its efforts in this regard arise from the same transaction or occurrence. Nor is there a "logical relationship" between the two sets of claims because the underlying agreements and circumstances may be *similar*: for proper joinder, all of the FTC's claims must arise "out of the *same* set of circumstances." Simmons, 1996 WL 617492, at *3 (quoting In re Orthopedic Bone Screw Prods. Liab. Litig., 1995 WL 428683, at *1) (emphasis added); see also O'Keefe v. Ace Rest. Supply, LLC, No. 11-1330, 2016 WL 145314, at *3 (E.D. Pa. Jan. 12, 2016) ("[T]he test for permissive joinder is not whether Defendants have exhibited the same behavior . . . ; the test that we must apply is whether the complainants derive their claims for relief from the same transaction or occurrence."); Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd., No. 08-42, 2013 WL 6481195, at *39 (E.D.N.Y. Sept. 20, 2013) ("Although Rule 20 is permissive, it cannot be met merely by joining together defendants that have no relationship other than that they violated the law in the same way against the same plaintiff."), report and recommendation adopted, 2014 WL 298594 (E.D.N.Y. Jan. 28, 2014); id. at *41 ("The fact that the defendants may be guilty of conduct that violates the antitrust laws in identical ways in similar factual circumstances does not connect that misconduct."); Spaeth v. Mich. State Univ. Coll. of Law, 845 F. Supp. 2d 48, 53 (D.D.C. 2012) ("[Plaintiff] cannot join defendants who simply engaged in similar types of behavior, but who are otherwise unrelated; *some allegation of concerted action between defendants is required*." (quotation marks and citation omitted)). Significantly, the FTC concedes that "the specific facts of these two reverse-payment agreements differ" and that "these claims involve different facts." (Doc. No. 73 at 9, 15.) There is no logical relationship.

The cases the FTC offers are inapposite.  For example, in <u>Kedra v. City of Philadelphia</u>, the plaintiffs were members of the same family who brought a civil rights action against Philadelphia and its police officers.  <u>See</u> 454 F. Supp. 652, 657-58 (E.D. Pa. 1978).  The plaintiffs alleged that the City employed all the officer defendants, and that "each of the individual defendants, 'separately and in concert,' acted . . . pursuant to their authority as agents, servants, and employees of defendant City of Philadelphia."  <u>Id.</u>  Because the defendants engaged in a "systematic pattern" of behavior, the court upheld their joinder.  <u>Id.</u> at 662.  There are no such allegations here.

Finally, the FTC argues that severance would prejudice its right to take discovery "on the Lidoderm claims."  (Doc. No. 73 at 10.)  Because I conclude that Defendants have been misjoined, I need not consider the Agency's prejudice argument.  <u>See</u> 7 Wright & Miller, Fed. Prac. & Proc. § 1653 (joinder impermissible where claims against defendants do not arise from same transaction or occurrence). In any event, the "prejudice" the Agency identifies is entirely contrived.  The FTC apparently has distorted Defendants' suggestion that severance will allow the Lidoderm claims—which Defendants believe will require less discovery—to proceed more quickly than the Opana claims—which purportedly will require more discovery.  (Doc. No. 57-1 at 8-10; Doc. No. 58-1 at 16-17.)  At this early stage, however, I have no idea whether Defendants' discovery assessments are correct.  Regardless, because severance has nothing do with the FTC's discovery rights, my decision to sever will not prejudice the Agency.

In sum, because it is apparent that the FTC's Opana and Lidoderm claims are misjoined, I will grant Defendants' Motions to Sever.

### B.     Transfer or Voluntary Dismissal

The FTC suggests that if I sever its claims against Impax and Watson, I transfer the

12

severed cases to the Northern District of California and the Northern District of Illinois, where related private MDL actions are pending.  28 U.S.C. § 1404(a); (Doc. No. 73 at 18-20.)  If I refuse to transfer, the FTC threatens "to voluntarily dismiss both actions pursuant to Federal Rule of Civil Procedure 41(a)(1) and refile them separately in the respective district courts."  (Id. at 18.)  The Agency thus suggests that "[i]t would be far more convenient for the parties and the judicial system for this Court to transfer the severed actions than for the FTC to go through the process of withdrawing and re-filing them."  (Id. at 20.)

I will decline the FTC's cavalier suggestion.  A *mea sponte* transfer would allow the Agency to circumvent Rule 41's anti–forum shopping provisions.  For example, if the FTC were voluntarily to dismiss the severed cases and refile them in other Districts, any subsequent voluntary dismissal would be deemed an adjudication on the merits.  See Fed. R. Civ. P. 41(a)(1)(B).  If the FTC is determined to leave this forum before I rule on Defendants' dismissal Motions, it does so at its own peril.

Significantly, even if the FTC voluntarily dismisses and refiles, I could still hear Defendants' motions for costs and counsel fees relating to the original action—including the fees and costs incurred in preparing their weighty dismissal Motions.  See Fed. R. Civ. P. 41(d); Ross v. Infinity Ins. Co., No. 12-5050, 2013 WL 2495114, at *3 (E.D. Pa. June 10, 2013) ("no question" that Rule 41 "authorizes a court to award costs and attorneys' fees as a condition of voluntary dismissal and numerous courts have done so where a voluntary dismissal has been granted" (quoting John Evans Sons, Inc. v. Majik-Ironers, Inc., 95 F.R.D. 186, 191 (E.D. Pa. 1982))).

Finally, because the FTC made the transfer suggestion only in its Response to the severance Motions, the Agency has not formally requested transfer, and the issue has not been

fully briefed.  Accordingly, I will decline the FTC's suggestion without prejudice to its right to file a formal transfer motion.  I note, however, that as Plaintiff, the FTC must make out "changed circumstances which have arisen since the time when the suit was instituted or . . . some basis in the interest of justice for transfer."  <u>Valido-Shade</u>, 2014 WL 4794967, at *2.

**V.      Conclusion**

The FTC has not met the first part of the Rule 20(a)(2) test:  its Opana-related claims and its Lidoderm-related claims do not arise from the same transactions or occurrences.  As I have noted, severance will not prejudice the Agency.  Accordingly, I will grant Defendants' Motions and sever under Rule 21.  In light of my decision, I need not address the other arguments Defendants have raised in support of severance.

An appropriate Order follows.

*/s/ Paul S. Diamond*

_____

Paul S. Diamond, J.